## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| SOJOURN CARE, INC. d/b/a <br> SOJOURN CARE OF TULSA, a <br> Delaware Corporation, <br> <br>         Plaintiff, <br> <br> v. <br> <br> MICHAEL O. LEAVITT, Secretary of <br> United States Department of <br> Health and Human Services, <br> <br>         Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No. 07-CV-375-GKF-PJC <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**Complaint For Declaratory And Injunctive Relief
And For Sums Due Under The Medicare Act**

Plaintiff, Sojourn Care, Inc. d/b/a Sojourn Care of Tulsa ("Sojourn Care"), through its attorneys, Scoggins & Cross, PLLC, for its Complaint against Defendant, Michael O. Leavitt, Secretary of the United States Department of Health and Human Services, alleges and states as follows:

### I. Introduction

1.  Plaintiff Sojourn Care is a Medicare certified hospice provider in Tulsa, Oklahoma. As a hospice provider, Sojourn Care provides hospice care to eligible terminally-ill Medicare patients and services to their families.

2.  The Federal government pays hospice providers like Sojourn Care pursuant to a Medicare program established under Title XVIII of the Social Security Act (the "Medicare Act"). The Department of Health and Human Services ("Medicare") administers the hospice benefit and reimburses hospice providers on a per diem basis for services to its beneficiaries. However, aggregate annual reimbursements to hospices are subject to an aggregate annual provider cap

(the "cap").  Any provider whose revenues from Medicare exceed its aggregate cap are subject to demands for repayment of the difference from Medicare.

3. On December 15, 2006, Medicare made a demand for repayment to Sojourn Care in the amount of $2,078,074 based upon its calculations for the fiscal year ended October 31, 2005.  On March 12, 2007, Sojourn Care timely filed an appeal of the cap determination with the Provider Reimbursement Review Board ("PRRB"), challenging the validity of the Federal regulation pursuant to which the cap was calculated.  Then, because it appeared that the PRRB lacked jurisdiction to assess the validity of a regulation, on April 20, 2007, Sojourn Care sought expedited judicial review of its appeal.  On May 16, 2007, the PRRB granted Sojourn Care's expedited judicial review request, finding that there are no material facts in dispute, that the amount in controversy exceeds $10,000, and that Sojourn's appeal involves principally a legal challenge to the validity of the regulation.  When the PRRB makes such a ruling, a Medicare provider has 60 days to file a civil action in Federal District Court. 42 U.S.C. §1395oo(f)(1).

4. Sojourn Care believes that Medicare regulation governing calculation of the cap, 42 C.F.R. § 418.309(b), is contrary to the plain language of section 1814(i)(2)(C) of the Medicare Act (codified at 42 U.S.C. § 1395f(i)(2)(C)), is arbitrary and capricious, and amounts to unlawful taking of private property for public use without just compensation in violation of the Fifth Amendment of the United States Constitution.  Sojourn Care has been severely prejudiced by Medicare's refusal to adhere to the Congressional mandate regarding the methodology for calculation of the cap.

5. Accordingly, by this action, Sojourn Care seeks a declaration and order that: (a) Medicare regulation 42 C.F.R. § 418.309(b) is invalid, (b) Medicare's prior calculations of

Sojourn Care cap amounts pursuant to 42 C.F.R. § 418.309(b) are invalid, and (c) Medicare must return to Sojourn Care all sums paid by Sojourn Care pursuant to demands based upon such invalid calculations and other further relief as appropriate.

## II.  Jurisdiction and Venue

6.    This action arises under the Medicare Act, 42 U.S.C. § 1395 et seq.

7.    This Court has jurisdiction under 42 U.S.C. § 1395oo(f) and 28 U.S.C. § 1331.

8.    Venue lies in this judicial district pursuant to 42 U.S.C. § 1395oo(f)(1) because this is the judicial district in which Sojourn Care is located.

## III.  Parties

9.    Sojourn Care provides hospice services to eligible Medicare patients in and around the Tulsa, Oklahoma area, namely patients who are terminally ill and who have been certified by physicians to have less than a six month life expectancy.  Sojourn Care has a place of business at 9910 E. 42nd Street South, Suite 101 Tulsa, Oklahoma 74146.

10.   Defendant Michael O. Leavitt is the Secretary of the United States Department of Health and Human Services, the federal agency responsible for administration of the Medicare program.

## IV.  Statutory And Regulatory Background

### A.  Hospice Benefit Background

11.   The hospice benefit started as an experiment in humane end-of-life care. In 1982, when Congress created the hospice benefit, two caps -- or limits -- were imposed. A lifetime cap limited each beneficiary to a maximum of 210 days of hospice care and a cap on providers limited the amount each hospice could bill Medicare in a single year.

12.   Initially, 95 percent of patients choosing hospice care were beneficiaries diagnosed with cancer who had exhausted or grown weary of other treatment options. They

stayed in hospice care for only days or weeks and few patients or providers ever exceeded either respective limits. As a result, few if any hospices ever encountered any cap issue.

13. By the early 1990s hospice was broadly recognized as superior end of life care, and proved highly effective at reducing expensive and often unwanted hospitalizations. At that time, however, 75 percent of Medicare beneficiaries with terminal illnesses -- those not suffering from cancer -- still did not have access to hospice services. Medicare required a physician to certify that a beneficiary had six months or less to live before referring them to hospice care. Many physicians chose not to refer non-cancer patients to hospice because of the uncertainties inherent in life expectancy calculations.

14. Congress took steps to address this obvious barrier in 1998 with legislation that eliminated the cap on a beneficiary's right to receive hospice care provided that a physician continued to certify that the patient had a life expectancy of six months or less if the disease runs a normal course. Pursuant to these changes, the Medicare Act now provides unlimited hospice coverage for individual Medicare beneficiaries who are certified as terminally ill with a life expectancy of six months or less. Specifically, the Medicare Act now allows hospice care for "two periods of 90 days each and an <u>unlimited</u> number of subsequent periods of 60 days." Section 1812(a)(4) and (d) of the Medicare Act (codified at 42 U.S.C. § 1395d(d)(1)) (emphasis added). The statutory provisions setting the hospice cap were not amended to make them consistent with the statutory expansions in hospice coverage.

15. Critically, at the same time, Medicare began developing objective standards to define non-cancer patient hospice eligibility so that physicians would have confidence in making terminal diagnoses. These objective standards seek to identify objective characteristics in nine distinct terminal illnesses that suggest an average six month life expectancy.

16. Today, more of America's terminally ill seniors are being given a hospice choice, and eligible beneficiaries are able to remain enrolled in hospice services until they pass away. Non-cancer patients now have better access to care, making up more than 50 percent of hospice patients. Nearly half of all Medicare patients who pass on have received end of life hospice care.

17. With these statutory changes, medically eligible beneficiaries are able to stay longer in hospice care. As a consequence, average length of stay is rising. But, notably, it remains below six months.

18. Hospice providers who are providing covered services to eligible Medicare beneficiaries have begun exceeding the cap at an alarming rate. In 1997, virtually no hospice providers exceeded the cap. In 2004, hospices in 15 states exceeded the cap. These providers were asked to repay Medicare an estimated $100 million. For fiscal year 2005, it is estimated that hospices in at least 25 states have exceeded the cap and that those providers have or will be asked to repay approximately $200 million to Medicare. In Oklahoma alone, a third of hospice providers may be subject to cap repayment demands for fiscal year 2005.

B. The Calculation of the Cap

19. Since inception, the Medicare Act has provided that total payments to a hospice provider in any fiscal year may not exceed an aggregate cap, calculated as the product of the individual cap amount (adjusted annually for inflation) and the "number of Medicare beneficiaries" in a hospice program in an accounting year. Section § 1814(i)(2)(A) of the Medicare Act (codified at 42 U.S.C. § 1395f(i)(2)(A)). In 2005, the cap amount per beneficiary was $19,777.51 per beneficiary. In spite of statutory expansions of coverage, Congress has yet to change the provider cap in the statute in any way.

20.     The Medicare Act specifically provides that the number of beneficiaries in an accounting year <u>must</u> be adjusted to reflect the time each such individual was provided hospice care in a previous or subsequent accounting year (42 U.S.C. § 1395f(i)(2)(C)):

> "For the purposes of subparagraph (A), the 'number of Medicare beneficiaries' in a hospice program in an accounting year is equal to the number of individuals who have made an election under subsection (d) of this section with respect to the hospice program and have been provided hospice care by (or under arrangements made by) the hospice program under this part in the accounting year, <u>such number reduced to reflect the proportion of hospice care that each such individual was provided in a previous or subsequent accounting year</u> or under a plan of care established by another hospice program." (Emphasis added.)

21.     In 1983, when Medicare issued its proposed regulation to implement the hospice cap, it acknowledged:

> "The statute specifies that the number of Medicare patients used in the calculation is to be adjusted to reflect the portion of care provided in a previous or subsequent reporting year or in another hospice."

48 Fed. Reg. 38,146, 38,158 (Aug. 22, 1983). Medicare also acknowledged that "The requirements [of the statute] do not allow discretion in the computation method." <u>Id.</u>

22. However, Medicare nonetheless declined to adopt the specific computation methodology mandated by Congress and instead chose to give providers credit for the cap only in the initial year of service, regardless whether the patient lived into another accounting year:

> "With respect to the adjustment necessary to account for situations in which a beneficiary's election overlaps two accounting periods, we are proposing to count each beneficiary <u>only in the reporting year in which the preponderance of the hospice care would be expected to be furnished rather than attempt to perform a proportional adjustment</u>."

(Emphasis added.)  48 Fed. Reg., <u>supra</u>, at 38,158 (Aug. 22, 1983).

23. In so doing, Medicare conceded that it was planning <u>not</u> to implement the plain language of the statute because it would be "difficult":

> "Although section 1814(i)(2)(C) of the Act specifies that the cap amount is to be adjusted 'to reflect the proportion of the hospice care that each such individual was provided in a previous or subsequent accounting year . . .' <u>such an adjustment would be difficult in that the proportion of the hospice stay occurring in any given year would not be known until the patient dies or exhausted his or her hospice benefits.  We believe the proposed alternative of counting the beneficiary in the reporting period where the beneficiary used most of the days of covered hospice care will achieve the intent of the statute without being burdensome.</u>"

(Emphasis added.)  48 Fed. Reg., <u>supra</u>, at 38,158 (Aug. 22, 1983).

24.     Notably, however, when it came to implementing the companion statutory requirement that the cap be apportioned among different hospices if two or more provided services to a specific patient, Medicare required such calculations:

> "When a beneficiary elects to receive hospice benefits from two different hospices, we are proposing a proportional application of the cap amount."
>
> *******************
>
> "We are aware that this type of apportioning of the beneficiary's stay may result in the inclusion of a beneficiary in the calculation of the cap for a reporting period other than the period for which the services were furnished, since it is necessary that the beneficiary die or exhaust his or her benefits before the percentage can be determined.  However, we believe that this proposal is <u>the most equitable means of implementing the statutory directive to adjust the cap amount</u> to reflect the proportion of care furnished under a plan of care established by another hospice program."

(Emphasis added.)  48 Fed. Reg., <u>supra</u>, at 38,158 (Aug. 22, 1983).  In short, Medicare demonstrated through its own conduct that apportionment of the cap across years was indeed possible.

25.     In December 1983, Medicare issued its final hospice reimbursement regulation, including the provision allocating the hospice cap amount for a beneficiary only in the initial year in which the patient elected hospice care.  The regulation provides:

> "Each hospice's cap amount is calculated by the intermediary by multiplying the adjusted cap amount determined in paragraph (a) of this section by the number of Medicare beneficiaries who elected to receive hospice care from that hospice during the cap period. For purposes of this calculation, the number of Medicare beneficiaries includes –
>
> (1) Those Medicare <u>beneficiaries who have not previously been included in the calculation of any hospice cap and who have filed an election to receive hospice care, in accordance with § 418.24 from the hospice during the period beginning on September 28 (35 days before the beginning of the cap period) and ending on September 27 (35 days before the end of the cap period)</u>.
>
> (2) In the case in which a beneficiary has elected to receive care from more than one hospice, each hospice includes in its number of Medicare beneficiaries only that fraction which represent the portion of a patient's total stay in all hospices that was spent in that hospice. . . "

42 C.F.R. § 418.309(b)(1) and (2) (emphasis added).

26.     To attempt to ameliorate the negative effects of the departure from the Congressional mandate to allocate the cap across years of care, Medicare shifted the initial reporting year for "first election" of care from the standard Medicare fiscal year (November 1 through October 31) to an earlier time frame (September 28 to following September 27). Thus, if a patient was admitted September 27, 2005, such patient's cap allocation would be entirely to

fiscal year 2005; however, if the same patient was admitted September 28, 2005, such patient's cap allocation would be entirely to fiscal year 2006. Sojourn Care alleges that this shift is insufficient to ameliorate the prejudice to hospice providers by Medicare's failure to allocate cap allowances proportionally to the years in which services are actually rendered.

27. Medicare's allocation of the cap amount only to the first reporting period in which the beneficiary elects the hospice benefit results in the assignment of the entire cap amount to the first reporting period even if most of the hospice care for that patient is rendered in a subsequent period. Thus, unused cap amounts in one fiscal year are "trapped" in the prior year, regardless whether the beneficiary continues to receive care in subsequent years. The failure to allocate the cap across years of care results in an understated aggregate hospice cap.

28. Medicare's failure to follow the Congressional mandate to allocate the cap proportionately across years of care subjects hospice providers to improper repayment demands for services properly rendered.

V. Facts Specific To This Case

29. Sojourn Care received its license as a hospice provider in Tulsa, Oklahoma in August 2002. Since that time, Sojourn Care has served approximately 2,000 patients in Tulsa.

30. In each of its first two full fiscal years (ending October 31, 2003 (fiscal year 2003) and October 31, 2004 (fiscal year 2004)), Sojourn Care had significant cap surpluses estimated to be in excess of $2.5 million in aggregate.

31. But, in the fiscal year 2005 (ended October 31, 2005), Sojourn Care served many patients first admitted in fiscal year 2004 and a few patients first admitted in fiscal year 2003. Medicare paid Sojourn Care for these services as rendered in fiscal year 2005. However, because of the cap regulation which traps cap room in prior years, Sojourn Care received no cap allocation for these patients in fiscal year 2005.

32. As a result, on December 15, 2006, Medicare sent Sojourn Care demand for repayment of $2,078,074 for exceeding its fiscal year 2005 cap. If Medicare had followed the Congressional mandate to allocate cap room across years of service, Sojourn Care alleges on information and belief that its cap liability for fiscal year 2005 would have been materially reduced or even eliminated entirely. As a result, Sojourn Care has suffered material prejudice from Medicare's failure to follow the Congressional mandated allocation of cap allowances across years of service.

## VI.  Assignment Of Errors

33. Medicare's regulation specifying the calculation of the hospice cap, specifically 42 C.F.R. § 418.309(b)(1), is contrary to the Medicare Act (specifically 42 U.S.C. § 1395f(i)(2)(C)), is arbitrary and capricious, and amounts to unlawful taking of private property for public use without just compensation in violation of the Fifth Amendment of the United States Constitution.

## VII.  Relief Requested

Sojourn Care respectfully requests the following relief:

1. A declaration that Medicare's regulation regarding the calculation of hospice cap, specifically 42 C.F.R. § 418.309(b)(1), is invalid.

2. A declaration that Medicare's prior calculation of Sojourn Care's cap liability for fiscal year 2005 is invalid.

3. An order requiring Medicare to return to Sojourn Care, with interest, all monies Sojourn Care has paid towards repayment of the alleged 2005 overpayment.

4. Pending resolution of this matter, a preliminary injunction enjoining Medicare from continuing to demand repayment of the alleged 2005 overpayment and from calculating

subsequent fiscal year alleged overpayments relating to Sojourn Care pursuant to the current version of 42 C.F.R. § 418.309(b)(1).

5. An order requiring defendant to pay legal fees and costs of suit incurred by plaintiff.

6. Such other and further relief as the Court may consider appropriate.

                                        Respectfully submitted,

                                        s/Linda G. Scoggins
                                        Linda G. Scoggins, OBA #8013
                                        **Scoggins & Cross, PLLC**
                                        204 N. Robinson, Suite 3100
                                        Oklahoma City, OK 73102
                                        (405) 239-4300  Telephone
                                        (405) 239-4305  Facsimile
                                        lscoggins@okhealthlawyer.com
                                        ATTORNEYS FOR PLAINTIFF