**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| SOJOURN CARE, INC. d/b/a SOJOURN CARE OF TULSA, a Delaware Corporation, <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL O. LEAVITT, Secretary of United States Department of Health and Human Services, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. 07-CV-375-GKF-PJC |

**PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

**COMES NOW** the Plaintiff, Sojourn Care, Inc. d/b/a Sojourn Care of Tulsa, a Delaware Corporation ("Sojourn Care"), and pursuant to Rule 56 of the Federal Rules of Civil Procedure, moves for summary judgment on its claim for declaratory relief because there is no genuine issue as to any fact material to the claim and Sojourn Care is entitled to judgment as a matter of law. In support of Sojourn Care's Motion for Summary Judgment, it relies on the undisputed material facts set forth below together with the argument and authorities following thereafter.

**UNDISPUTED MATERIAL FACTS**

(1)   The Federal Government pays hospice providers pursuant to a Medicare program established under Title XVIII of the Social Security Act (the "Medicare Act"). The Department of Health and Human Services ("Medicare") administers the hospice benefit and reimburses hospice providers on a per diem basis for services to its beneficiaries. (Complaint, ¶ 2; and Answer, ¶ 2.)

(2)  Plaintiff Sojourn Care, Inc. is a Medicare-certified hospice provider in Tulsa, Oklahoma. (Complaint, ¶ 1; and Answer, ¶ 1.)

(3) Under the Medicare Act, aggregate annual reimbursements to hospices are subject to an aggregate annual provider cap (the "cap"). Any provider whose revenues from Medicare exceed the cap are subject to demands by Medicare for repayment. (Complaint, ¶ 2; and Answer, ¶ 2.)

(4) On December 15, 2006, Medicare made a demand for repayment to Sojourn Care in the amount of $2,078,074 based on Medicare's calculations of the cap for the fiscal year ended October 31, 2005. (Record, attached to Plaintiff's Request for Judicial Notice in Support of Its Motion for Summary Judgment ("RJN") as Ex. 1.)

(5) On March 12, 2007 Sojourn Care timely filed an appeal of the cap determination with Medicare's Provider Reimbursement Review Board ("PRRB"). The appeal challenged the validity of the Federal regulation pursuant to which the cap was calculated. (Record, attached to RJN as Ex. 1.)

(6) On April 20, 2007, Sojourn Care sought permission from the PRRB to seek expedited judicial review rather than have the PRRB determine the controversy. (Record, attached to RJN as Ex. 1.)

(7) On May 16, 2007, the PRRB granted Sojourn Care's expedited judicial review request. (Record, attached to RJN as Ex. 1.)

(8) The Medicare Act addresses calculation of the cap and specifically provides:

"For the purposes of subparagraph (A), the 'number of Medicare beneficiaries' in a hospice program in an accounting year is equal to the number of individuals who have made an election under subsection (d) of this section with respect to the hospice program and have been provided hospice care by (or under arrangements made by) the hospice program under this part in the accounting year, <u>such number reduced to reflect the proportion of hospice care that each such individual was provided in a previous or subsequent accounting year</u> or under a plan of care established by another hospice program." (Emphasis added.)

(42 U.S.C. § 1395f(i)(2)(C), attached to RJN as Ex. 3.)

(9) In 1983, Medicare published rules implementing the cap. In these publications, Medicare admitted:

2

"The statute specifies that the number of Medicare patients used in the calculation is to be adjusted to reflect the portion of care provided in a previous or subsequent reporting year or in another hospice."

(48 F.R. 38,146, 38,158 (Aug. 22, 1983), attached to RJN as Ex. 6.)

(10)  In the same proposed regulations, Medicare also admitted:

"With respect to the adjustment necessary to account for situations in which a beneficiary's election overlaps two accounting periods, we are proposing to count each beneficiary <u>only in the reporting year in which the preponderance of the hospice care would be expected to be furnished rather than attempt to perform a proportional adjustment</u>."  (Emphasis added.)

(48 F.R. 38,146 at 38,158 (Aug. 22, 1983), attached to RJN as Ex. 6.)

(11)  In the same proposed regulations, Medicare also admitted:

"Although section 1814(i)(2)(C) of the Act specifies that the cap amount is to be adjusted 'to reflect the proportion of the hospice care that each such individual was provided in a previous or subsequent accounting year . . .' <u>such an adjustment would be difficult in that the proportion of the hospice stay occurring in any given year would not be known until the patient dies or exhausted his or her hospice benefits. We believe the proposed alternative of counting the beneficiary in the reporting period where the beneficiary used most of the days of covered hospice care will achieve the intent of the statute without being burdensome.</u>"  (Emphasis added.)

(48 F.R. 38,146 at 38,158 (Aug. 22, 1983), attached to RJN as Ex. 6.)

(12)  In the same proposed regulations, Medicare also admitted:

"When a beneficiary elects to receive hospice benefits from two different hospices, we are proposing a proportional application of the cap amount."

*********************

"We are aware that this type of apportioning of the beneficiary's stay may result in the inclusion of a beneficiary in the calculation of the cap for a reporting period other than the period for which the services were furnished, since it is necessary that the beneficiary die or exhaust his or her benefits before the percentage can be determined.  However, we believe that this proposal is <u>the most equitable means of implementing the statutory directive to adjust the cap amount</u> to reflect the proportion of care furnished under a plan of care established by another hospice program."  (Emphasis added.)

(48 F.R. 38,146 at 38,158 (Aug. 22, 1983), attached to RJN as Ex. 6.)

(13) The final regulation issued by Medicare concerning the cap contains the following language:

> "Each hospice's cap amount is calculated by the intermediary by multiplying the adjusted cap amount determined in paragraph (a) of this section by the number of Medicare beneficiaries who elected to receive hospice care from that hospice during the cap period.  For purposes of this calculation, the number of Medicare beneficiaries includes –
> (1) Those Medicare beneficiaries who have not previously been included in the calculation of any hospice cap and who have filed an election to receive hospice care, in accordance with § 418.24 from the hospice during the period beginning on September 28 (35 days before the beginning of the cap period) and ending on September 27 (35 days before the end of the cap period).
> (2) In the case in which a beneficiary has elected to receive care from more than one hospice, each hospice includes in its number of Medicare beneficiaries only that fraction which represent the portion of a patient's total stay in all hospices that was spent in that hospice. . . "

(42 C.F.R. § 418.309(b)(1) and (2), attached to RJN as Ex. 5.)

## I. INTRODUCTION

Hospices throughout the country provide humane end-of-life care to terminally ill patients. The Medicare Act provides for reimbursement to hospices for such care rendered to eligible Medicare beneficiaries.  However, because of the regulation used to implement the cap on hospice payments under the Medicare Act, hospice providers, like Sojourn Care, may be forced to close their businesses.

Sojourn Care submits it is entitled to judgment as a matter of law and requests that this Court declare  42 C.F.R. § 418.309(b)(1) (the regulation by which the aggregate cap amount is calculated) ("Regulation") invalid because it is directly contrary to Congress' express directive in Section 1814 (i)(2)(C) of the Medicare Act (codified at 42 U.S.C. §1395f (i)(2)(C)).

## II. FACTUAL BACKGROUND

A.   **The Medicare Act**

In 1982, Congress created the hospice benefit to provide end-of-life care to terminally ill patients.  In devising this benefit, Congress imposed two limits: (a) hospice care was limited to a

4

maximum of 210 days; and (b) the amount each hospice could bill Medicare in a year was set on a per patient basis. In 1998, Congress removed the first limit. Now, a patient may remain in hospice care for an **unlimited** number of days provided they remain certified as terminally ill with a life expectancy of six months or less. (42 U.S.C. § 1395d(d)(1), attached to RJN as Ex. 2.) However, Congress has not yet changed the other limit, namely that the total payments to a hospice provider in any fiscal year may not exceed an aggregate cap, calculated as the product of the individual cap amount (adjusted annually for inflation) and the "number of Medicare beneficiaries" in a hospice program in an accounting year. (Section § 1814(i)(2)(A) of the Medicare Act (codified at 42 U.S.C. § 1395f(i)(2)(A), attached to RJN as Ex. 3.)

The Medicare Act specifically provides that the number of beneficiaries in an accounting year <u>must</u> be adjusted to reflect the time each such individual was provided hospice care in a previous or subsequent accounting year (UF 8; 42 U.S.C. § 1395f(i)(2)(C), attached to RJN as Ex. 3):

> "For the purposes of subparagraph (A), the 'number of Medicare beneficiaries' in a hospice program in an accounting year is equal to the number of individuals who have made an election under subsection (d) of this section with respect to the hospice program and have been provided hospice care by (or under arrangements made by) the hospice program under this part in the accounting year, <u>such number reduced to reflect the proportion of hospice care that each such individual was provided in a previous or subsequent accounting year</u> or under a plan of care established by another hospice program." (Emphasis added.)

### B. The Regulation at Issue

In 1983, when Medicare issued its proposed regulation to implement the hospice cap, it acknowledged:

> "The statute specifies that the number of Medicare patients used in the calculation is to be adjusted to reflect the portion of care provided in a previous or subsequent reporting year or in another hospice."

(UF 9; 48 F.R. 38,146, 38,158 (Aug. 22, 1983), attached to RJN as Ex. 6.) However, Medicare nonetheless declined to adopt a regulation consistent with Congress' mandate and instead chose to

give providers credit for the cap only in the initial year of service, regardless whether the patient lived into another accounting year:

> "With respect to the adjustment necessary to account for situations in which a beneficiary's election overlaps two accounting periods, we are proposing to count each beneficiary <u>only in the reporting year in which the preponderance of the hospice care would be expected to be furnished rather than attempt to perform a proportional adjustment</u>."  (Emphasis added.)

(Undisputed Fact ("UF") 10; 48 F.R., <u>supra</u>, at 38,158 (Aug. 22, 1983), attached to RJN as Ex. 6.)

In so doing, Medicare conceded that it was <u>planning not to implement</u> the plain language of the statute because it would be "difficult":

> "Although section 1814(i)(2)(C) of the Act specifies that the cap amount is to be adjusted 'to reflect the proportion of the hospice care that each such individual was provided in a previous or subsequent accounting year . . .' <u>such an adjustment would be difficult in that the proportion of the hospice stay occurring in any given year would not be known until the patient dies or exhausted his or her hospice benefits. We believe the proposed alternative of counting the beneficiary in the reporting period where the beneficiary used most of the days of covered hospice care will achieve the intent of the statute without being burdensome.</u>"  (Emphasis added.)

(UF 11; 48 F.R., <u>supra</u>, at 38,158 (Aug. 22, 1983), attached to RJN as Ex. 6.)

Notably, however, when it came to implementing the companion statutory requirement that the cap be apportioned among different hospices if two or more provided services to a specific patient, Medicare did require such calculations:

> "When a beneficiary elects to receive hospice benefits from two different hospices, we are proposing a proportional application of the cap amount."
>
> ********************
>
> "We are aware that this type of apportioning of the beneficiary's stay may result in the inclusion of a beneficiary in the calculation of the cap for a reporting period other than the period for which the services were furnished, since it is necessary that the beneficiary die or exhaust his or her benefits before the percentage can be determined. However, we believe that this proposal is <u>the most equitable means of implementing the statutory directive to adjust the cap amount</u> to reflect the proportion of care furnished under a plan of care established by another hospice program."  (Emphasis added.)

(UF 12; 48 F.R., <u>supra</u>, at 38,158 (Aug. 22, 1983), attached to RJN as Ex. 6.)

6

**In short, Medicare demonstrated through its own conduct that apportionment of the cap across years was indeed possible.**

In December 1983, Medicare issued its final hospice reimbursement regulations, including the provision allocating the hospice cap amount for a beneficiary only in the initial year in which the patient elected hospice care. The regulation provides:

> "Each hospice's cap amount is calculated by the intermediary by multiplying the adjusted cap amount determined in paragraph (a) of this section by the number of Medicare beneficiaries who elected to receive hospice care from that hospice during the cap period. For purposes of this calculation, the number of Medicare beneficiaries includes –
> (1) Those Medicare <u>beneficiaries who have not previously been included in the calculation of any hospice cap and who have filed an election to receive hospice care, in accordance with § 418.24 from the hospice during the period beginning on September 28 (35 days before the beginning of the cap period) and ending on September 27 (35 days before the end of the cap period)</u>.
> (2) In the case in which a beneficiary has elected to receive care from more than one hospice, each hospice includes in its number of Medicare beneficiaries only that fraction which represent the portion of a patient's total stay in all hospices that was spent in that hospice. . . " (Emphasis added.)

(UF 13; 42 C.F.R. § 418.309(b)(1) and (2), attached to RJN as Ex. 5.) Notably, Medicare's reporting year for hospices runs from November 1 to October 31 of each year. Medicare recognized that its method of limiting cap allocation to a single year per patient would be prejudicial to hospices who provided a few days of care in one year with the majority of care in the next year. In an attempt to ameliorate this prejudice, Medicare advanced the initial year cap calendar 35 days earlier based on its assumption that the average length of stay in hospice care was 70 days. (48 F.R. 56,008, Section IV(d), attached to RJN as Ex. 7.) Under Medicare's revised cap year, if a patient's care started on or after September 28, that patient's cap computation would be pushed to the second year of care, not the first year of care.

However, Medicare's adjustment does not prevent the prejudice suffered by hospices due to Medicare's failure to follow Congress' mandate of dividing the cap over subsequent years of care. In fact, in calendar year 2005, 15 states had average lengths of stay in hospices in excess of 70 days.

7

(Declaration of David Daucher ("Daucher, Decl."), Ex. A.)  According to Medicare's own document, the average length of stay in hospices in Oklahoma in calendar year 2005 was 108 days, far in excess of 69 days or less. (Id.)  Sojourn Care's average length of stay in calendar year 2005 was 131 days (see below). See 42 U.S.C. 1395d(d)(1) (unlimited days permitted), attached to RJN as Ex. 2.

Medicare's allocation of the cap amount only to the first reporting period in which the beneficiary elects the hospice benefit results in the assignment of the entire cap amount to the first reporting period even if most of the hospice care for that patient is rendered in a subsequent period. Thus, unused cap amounts in one fiscal year are "trapped" in the prior year, regardless whether the beneficiary continues to receive care in subsequent years.  The failure to allocate the cap across years of care results in an understated aggregate hospice cap for specific providers like Sojourn Care.

      C.     **Sojourn Care and The History Behind This Lawsuit**

Sojourn Care received its license as a hospice provider in Tulsa, Oklahoma in August 2002. (UF 2 and Daucher Decl., ¶ 4.)  Since that time, Sojourn Care has served approximately 2,000 patients in Tulsa. (Daucher Decl., ¶ 4.)  In each of its first two full fiscal years (ending October 31, 2003 (fiscal year 2003) and October 31, 2004 (fiscal year 2004)), Sojourn Care had significant cap surpluses in excess of $2.1 million in aggregate. (Daucher Decl., Ex. B.)

But, in fiscal year 2005 (ended October 31, 2005), Sojourn Care served many patients first admitted in fiscal year 2004 and a few patients first admitted in fiscal year 2003. (Daucher Decl., ¶ 6.)  Medicare paid Sojourn Care for these services as rendered in fiscal year 2005.  However, because of the cap regulation which traps cap room in prior years, Sojourn Care received no cap allocation for these patients in fiscal year 2005. (Daucher Decl., ¶ 6.)  Notably, for calendar year

2005, Sojourn Care took care of a total of 861 Medicare patients for a total of 112,747 Medicare days of service, yielding an average length of stay of 131 days. (Daucher Decl., Ex. C.)

As a result, on December 15, 2006, Medicare sent Sojourn Care demand for repayment of $2,078,074 for exceeding its fiscal year 2005 cap. (UF 4, Record, attached to RJN as Ex. 1.) If Medicare had followed the Congressional mandate to allocate cap room across years of service, Sojourn Care's cap liability for fiscal year 2005 would have been materially reduced if not eliminated entirely.

Therefore, on March 12, 2007 Sojourn Care timely filed an appeal of the cap determination with Medicare's Provider Reimbursement Review Board ("PRRB"). The appeal challenged the validity of the Federal regulation pursuant to which the cap was calculated. (UF 5, Record, attached to RJN as Ex. 1.)

On April 20, 2007, Sojourn Care sought permission from the PRRB to seek expedited judicial review rather than have the PRRB determine the controversy. (UF 6, Record, attached to RJN as Ex. 1.)

On May 16, 2007, the PRRB granted Sojourn Care's expedited judicial review request, finding that there are no material facts in dispute and that Sojourn Care's appeal involves principally a legal challenge to the validity of the regulation. (UF 7, Record, attached to RJN as Ex. 1.) Moreover, the PRRB specifically found that the amount in controversy exceeds $10,000. (Record, attached to RJN as Ex. 1.)

The PRRB further determined that "it is without the authority to decide the legal question of whether the regulation, 42 C.F.R. §418.309(b), is valid" and that the issue falls within the provisions of 42 U.S.C. §1395oo (f)(1) (allowing for expedited judicial review). (Record, attached to RJN as Ex. 1.)

Accordingly, Sojourn Care has brought action herein against Defendant Michael O. Leavitt, Secretary of the United States Department of Health and Human Services ("HHS") for declaratory relief regarding the invalidity of the cap regulation found at 42 C.F.R. 418.309(b)(1).

### III.  STANDARD FOR SUMMARY JUDGMENT UNDER RULE 56 OF THE FEDERAL RULES OF CIVIL PROCEDURE.

A motion for summary judgment should be granted where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Douglas-Guardian Warehouse Corp. v. Posey*, 486 F.2d 739 (10th Cir. 1973). Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material fact exists, all facts and inferences should be viewed in the light most favorable to the nonmoving party. *Burnette v. Dow Chemical Co.*, 849 F.2d 1269 1273 (10th Cir. 1988). However, "even under this standard there are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Brunette*, 849 F.2d at 1273.

### IV.  ARGUMENT AND AUTHORITIES

#### A.  The Hospice Cap Calculation Required by 42 C.F.R. §418.309(b), Is Invalid Because It Directly Conflicts With Section 1814 (i)(2)(C) of the Medicare Act.

In reviewing an agency's construction of a statute which it administers, there are two questions that must be answered: (1) "whether Congress has directly spoken to the precise question at issue;" and, (2) if not, "whether the agency's answer is based on a permissible construction of the statute." *Chevron, U.S.A., Inc. v. NRDC, Inc, et al*, 467 U.S. 837, 842-843, 104 S.Ct. 2778, 2781-2782 (1984). In answering the first question, "no deference [to the agency] is due." *Strickland v. Commissioner, Maine Dept. of Ag., et al*, 921 F. Supp 21 (D.Me. 1996).

In interpreting statutory texts, words should be given their ordinary meaning unless context requires a different result. *Gonzales v. Carhart*, 05-380 (U.S. 4-18-2007)**,** 127 S.Ct. 1610, 167 L.Ed 2d 480 (2007). It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme. *National Ass'n of Home Builders v. Defenders of Wildlife***,** 06-340 (U.S. 6-25-2007), 127 S. Ct. 2518 (2007).

In this case, Congress has clearly spoken to the specific question at issue – the allocation of cap room for individual patients across years of service. Since inception, the Medicare Act has provided that total payments to a hospice provider in any fiscal year may not exceed an aggregate cap, calculated as the product of the individual cap amount (adjusted annually for inflation) and the "number of Medicare beneficiaries" in a hospice program in an accounting year. Section § 1814(i)(2)(A) of the Medicare Act (codified at 42 U.S.C. § 1395f(i)(2)(A)), attached to RJN as Ex. 3. The Medicare Act specifically provides that the number of beneficiaries in an accounting year <u>must</u> be adjusted to reflect the time each such individual was provided hospice care in a previous or subsequent accounting year. 42 U.S.C. § 1395f(i)(2)(C), attached to RJN as Ex. 3. Specifically, Section 1395f (i)(2)(C), provides:

> "For the purposes of subparagraph (A), the 'number of Medicare beneficiaries' in a hospice program in an accounting year is equal to the number of individuals who have made an election under subsection (d) of this section with respect to the hospice program and have been provided hospice care by (or under arrangements made by) the hospice program under this part in the accounting year, <u>such number reduced to reflect the proportion of hospice care that each such individual was provided in a previous or subsequent accounting year</u> or under a plan of care established by another hospice program." (Emphasis added.)

In December 1983, and in spite of the foregoing statutory language, Medicare issued its final hospice reimbursement regulation, including the provision allocating the hospice cap amount for a

11

beneficiary only in the initial year in which the patient elected hospice care.[1] The regulation provides:

> "Each hospice's cap amount is calculated by the intermediary by multiplying the adjusted cap amount determined in paragraph (a) of this section by the number of Medicare beneficiaries who elected to receive hospice care from that hospice during the cap period.  For purposes of this calculation, the number of Medicare beneficiaries includes –
>   (1) Those Medicare <u>beneficiaries who have not previously been included in the calculation of any hospice cap and who have filed an election to receive hospice care, in accordance with § 418.24 from the hospice during the period beginning on September 28 (35 days before the beginning of the cap period) and ending on September 27 (35 days before the end of the cap period)</u>.
>   (2) In the case in which a beneficiary has elected to receive care from more than one hospice, each hospice includes in its number of Medicare beneficiaries only that fraction which represent the portion of a patient's total stay in all hospices that was spent in that hospice. . . "  (Emphasis added.)

42 C.F.R. § 418.309(b)(1) and (2), attached to RJN as Ex. 5.  In fact,  when Medicare issued its proposed regulation to implement the hospice cap, it expressly acknowledged the conflict between the Statute and its proposed regulation:

> "The statute specifies that the number of Medicare patients used in the calculation is to be adjusted to reflect the portion of care provided in a previous or subsequent reporting year or in another hospice."

48 F.R. 38,146, 38,158 (Aug. 22, 1983), attached to RJN as Ex. 6.

Medicare nonetheless declined to adopt the specific computation methodology mandated by Congress, and instead chose to give providers credit for the cap only in the initial year of service, regardless whether the patient lived into another accounting year:

> "With respect to the adjustment necessary to account for situations in which a beneficiary's election overlaps two accounting periods, we are proposing to count each beneficiary <u>only in the reporting year in which the preponderance of the hospice care would be expected to be furnished rather than attempt to perform a proportional adjustment</u>."

---

[1] "A regulation's age is no antidote to clear inconsistency with a statute." *Brown v. Gardner*, 513 U.S. 115, 122,  115 S.Ct. 552, 557 (1994).

(Emphasis added.) 48 F.R., supra, at 38,158 (Aug. 22, 1983), attached to RJN as Ex. 6.

In so doing, Medicare conceded that it was planning not to implement the plain language of the statute because it would be "difficult." The Secretary rationalized:

> "Although section 1814(i)(2)(C) of the Act specifies that the cap amount is to be adjusted 'to reflect the proportion of the hospice care that each such individual was provided in a previous or subsequent accounting year . . .' such an adjustment would be difficult in that the proportion of the hospice stay occurring in any given year would not be known until the patient dies or exhausted his or her hospice benefits. We believe the proposed alternative of counting the beneficiary in the reporting period where the beneficiary used most of the days of covered hospice care will achieve the intent of the statute without being burdensome."

(Emphasis added.) 48 F.R., supra, at 38,158 (Aug. 22, 1983), attached to RJN as Ex. 6. Indeed, Medicare admitted its failure to comply with Congress' mandate in its Second Affirmative Defense in its Answer to Sojourn's Complaint. Specifically, Medicare asserted that compliance with the statute authorizing Medicare reimbursement for hospice care is allegedly "factually impossible." This assertion is demonstrably incorrect as Medicare abides Congress' mandate and apportions the cap between fiscal years when two hospices (rather than one hospice) provide care to a single patient:

> "We are aware that this type of apportioning of the beneficiary's stay may result in the inclusion of a beneficiary in the calculation of the cap for a reporting period other than the period for which the services were furnished, since it is necessary that the beneficiary die or exhaust his or her benefits before the percentage can be determined. However, we believe that this proposal is the most equitable means of implementing the statutory directive to adjust the cap amount to reflect the proportion of care furnished under a plan of care established by another hospice program." (Emphasis added.)

48 F.R., supra, at 38,158 (Aug. 22, 1983), attached to RJN as Ex. 6. Therefore, the claim of "difficulty" or "impossibility" is without merit. Medicare makes the very same determination it claims is too difficult/impossible in any case where a patient uses two hospices across two years. If a single hospice provides care across two years, it should be entitled to the same calculation, the calculation mandated by Congress.

Congress' express mandate regarding the calculation to be used in allocating the applicable cap, coupled with the fact that the HHS Regulations blatantly ignore the Congressional requirement, should end the inquiry. Congress has directly spoken to the issue of the cap allocation, and the language of §418.309(b)(1) that flies in the face of the statutory provision should be deemed invalid.

Medicare's impermissible construction of the statute in the Regulation is further highlighted by the fact that it made attempts to ameliorate the negative effects of its departure from Congress' mandate to allocate the cap across years of care. Medicare shifted the initial reporting year for "first election" of care from the standard Medicare fiscal year (November 1 through October 31) to an earlier time frame (September 28 to following September 27). Thus, if a patient was admitted September 27, 2005, such patient's cap allocation would be entirely to fiscal year 2005; however, if the same patient was admitted September 28, 2005, such patient's cap allocation would be entirely to fiscal year 2006.

However, this shift, based on the faulty assumption of a stay of less than 70 days is insufficient. In calendar year 2005, 15 states had average lengths of stay in excess of 70 days. (Daucher Decl., Ex. A.) In Oklahoma in 2005, the average length of stay in hospice care was 108 days. (Daucher Decl., Ex. A.) For 2005, Sojourn Care's average length of stay in hospice care was 131 days. (Daucher Decl., ¶ 7, Ex. C.) And, in fact, the statute expressly permits an **unlimited number of days of hospice care**. (42 U.S.C. § 1395d(d)(1), attached to RJN as Ex. 2.)

Medicare's allocation of the cap amount only to the first reporting period in which the beneficiary elects the hospice benefit results in the assignment of the entire cap amount to the first reporting period even if most of the hospice care for that patient is rendered in a subsequent period. Thus, unused cap amounts in one fiscal year are "trapped" in the prior year, regardless whether the beneficiary continues to receive care in subsequent years and subjects hospice providers to improper

14

repayment demands for services properly rendered. The failure to allocate the cap across years of care is contrary to Congress' mandate that the individual cap allowance be allocated proportionately across years of service.

## V. CONCLUSION

Medicare is required to administer the hospice benefit and reimburse hospice providers on a per diem basis for services to its beneficiaries in accord with the Medicare Act. Medicare's cap regulation blatantly ignores the allocation method expressly mandated by Congress, thereby injuring hospice providers.

**WHEREFORE**, plaintiff Sojourn Care, Inc. respectfully requests that this Court grant summary judgment in its favor and against Defendant and find that the cap allocation in 42 C.F.R. §418.309(b) is invalid because it contradicts the clearly expressed mandate and intent of Congress. Sojourn Care also requests this Court award it any and all such relief that flow from such findings.

Respectfully submitted,

s/Linda G. Scoggins
Linda G. Scoggins, OBA #8013
**Scoggins & Cross, PLLC**
204 N. Robinson, Suite 3100
Oklahoma City, OK 73102
(405) 239-4300  Telephone
(405) 239-4305  Facsimile
lscoggins@okhealthlawyer.com
ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

      I hereby certify that on the 25th day of October, 2007, a true and correct copy of the foregoing was electronically transmitted to the following counsel of record:

Peter D. Keisler
Assistant Attorney General

David E. O'Meillia
United State Attorney

Sheila Lieber
Daniel Bensing (D.C. Bar No. 334268)

U.S. Department of Justice
Civil Division
Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044
Attorneys for the United States of America

                                                                     s/ Linda G. Scoggins
                                                                     Linda G. Scoggins, Esq.